The People *v.* Sprague.

---

KINGS OYER AND TERMINER, October, 1849. Before *Morse*, Justice of the Supreme Court, and the Justices of the Sessions.

### THE PEOPLE *vs.* CHARLES SPRAGUE.

It is a defence to an indictment for crime, that the act complained of was done under an insane impulse, which, at the time, destroyed the capacity to distinguish between right and wrong.

On the trial of an indictment for robbing a female of her shoe, in day light, in the public street of a city, it being proved that the accused had been, for several years, and ever since an injury to his head, which it was supposed had affected his brain, in the habit of taking the shoes of females, wherever he could find them, and secreting them without any apparent object for so doing, and that insanity was a hereditary disease in the family of the prisoner on the side of his mother, with other circumstances tending to establish *monomania*, after hearing the testimony of eminent medical men on the subject, the prisoner was acquitted on the ground of insanity.

The prisoner was indicted for robbery, alleged to have been committed upon the 18th of August, 1849, and was tried at the Oyer and Terminer for Kings county, on the 10th of October following.

*H. B. Duryea,* (District Attorney,) for the people.

*J. Dikeman and A. J. Spooner,* for the prisoner.

*Sarah Watson* testified that about eight o'clock in the morning of the 18th of August, she was walking along Pearl street,

in the city of Brooklyn, and hearing some person behind her, looked round and saw the prisoner, who immediately seized her, threw her down, and took a shoe from one of her feet, and ran away. She testified that at the time, she had a gold chain upon her person, but that it could not be seen by the prisoner. She also stated that there was a man near by, who was unknown to her, but who hallooed at the prisoner, and gave chase to him, but that the prisoner outran him and escaped. It was admitted by the prisoner's counsel, that the shoe of Miss Watson was found in the prisoner's overcoat pocket, about ten o'clock of the same day, at the printing office of the Long Island Star. It was proved that the prisoner was a printer by trade, and was then employed as a journeyman in the office of the Star; that he came to the office upon that morning at his usual time, hung up his overcoat and went to his work as he had done before. One of the proprietors of the Star, hearing of the circumstances of the outrage upon Miss Watson, and her description of its perpetrator, suspected the prisoner, and demanded of him the shoe he had taken from the foot of a young lady that morning. The prisoner replied, "It's in my overcoat pocket." The shoe was taken from the pocket of the prisoner's overcoat, and afterwards identified by Miss Watson as the one taken from her in the street. The prisoner made no attempt at concealment or explanation.

The counsel for the prisoner admitted that if the prisoner was sane, he was guilty of the crime for which he was on trial. The prisoner's counsel called the

*Rev. Isaac N. Sprague,* father of the prisoner, a highly respectable congregational minister, who testified that the prisoner's age was twenty-five years; that he had generally resided in the family of the witness, but had spent a year with a brother at Hartford, Connecticut, where he went about four years before; that since his return from Hartford the prisoner had lived with the witness; that the prisoner was married in the year 1847, and was with his wife living at the house of the witness at the time of the assault upon Miss Watson; that the prisoner had, at different times received wounds and bruises

upon the head; that when quite young he was struck with a hoe near the crown of the head, producing an open wound, which after some time closed and healed up; that when about twelve years old, the prisoner fell from a cherry tree, striking upon his head. That witness, with his family, moved to Hartford in 1837 or 1838, and soon after the prisoner fell from the balcony of a second story, and was brought home insensible; that no immediate effect seemed to be produced upon the prisoner's mind by this accident, but that soon after his conduct became strange. He testified that his (witness's) mother had been insane for eight years, and some part of the time in an insane hospital; that a brother of his mother became insane and hung himself; that two sisters of his mother were occasionally insane; that his grandmother, on his mother's side, was also insane. He stated that he and his wife had always known the mind of the prisoner to be not as strong as the minds of their other children; that after the fall from the balcony the prisoner was more carefully watched and kept in, and some painful indications were developed in the prisoner—as at times a remarkable prominence of the eye, and a dullness, which appeared to increase, and a physician was consulted. An effort was made to educate the prisoner for college, but found that could not be done. About this time a shoe of some female member of the family would be missing, and when found would frequently be wet and crumpled up; that a girl, named Almira Godfrey, who was living in witness's family at the time, was at first suspected, but at length one of her shoes was missing, and when found was also wet and crumpled like the others. The family then suspected Charley, (prisoner,) and soon found it was he who took away the shoes. When a shoe was missing, it would be found sometimes under his pillow, sometimes between the straw and feather bed, sometimes in his trunk, and sometimes in his pocket, generally with clothes wound round the shoe, as if to conceal it. That the prisoner, before his fall from the balcony, had been truthful, and of a frank and open demeanor, and willing to acknowledge the truth, though to his disadvantage. After it was found he took the shoes, whenever one was missed

and I spoke about it, he would hang his head and say he did not know, but the shoe would be found somewhere secreted. On some occasions, when a shoe had been missed, and found under his pillow, his mother would say to him, " Charley, another shoe gone;" to which he would reply, " I'm sure I didn't do it;" his mother would say, " I found it under your pillow;" then he would admit it. He seemed not to have a memory of the fact. I punished him for taking shoes, but I soon thought I could recognize the features of insanity in his conduct. Pains were taken to keep shoes out of his way, and they were put in drawers, and he would take them out of the drawers in the night. At times the prisoner had fullness of eyes, a vacancy of the eye was frequently apparent. We kept him in evenings, and away from exciting amusements. About the time of the affair for which prisoner is on trial, he complained a good deal of headache; that witness had sometimes sent Charles (the prisoner) to the country. He was once away for about two years. His practice of taking and secreting shoes has continued down to the present time, although it has intermitted. I went to board with prisoner last May His wife would miss her shoes occasionally, and they would be found where the prisoner had secreted them.

On cross-examination, this witness said that he saw the wound from the hoe; that he did not see the wound caused by the prisoner's fall from the cherry tree, which took place in Vermont; that he saw the wound occasioned by the fall from the balcony: that all apprehension passed away in a day or two after the fall from the balcony, but soon after came the protruding and glassiness of the eye; that he was then between twelve and fourteen years old, and went to school; that his moral sense seemed to be somewhat blunted; that he was not as truthful as before.

There were also read in defence, the deposition of Thomas Sprague, of Michigan, (a brother of prisoner,) and of Mary E., his wife, and of Julia A. Hyde, a sister of prisoner's father, and of Oliver Hyde, her husband, of Rebecca Freeman and Maria King, all witnesses living out of the state. The depositions

of Thomas Sprague and wife were principally to the habit of the prisoner while living with them, to take shoes of ladies and secrete them. Some of the depositions spoke of the fact of the fall from the cherry tree in Vermont, and some of them proved the insanity of the relations of the prisoner, in corroboration of the statement of the prisoner's father.

*Charles H. Nichols*, M. D., testified that he was twenty-nine years of age; that from May, 1847, to March, 1849, he was at the State Insane Asylum at Utica, and in April, 1849, came to the asylum at Bloomingdale, of which he had had the charge since. That while he was at Utica there were about eight hundred patients in the asylum, and about one hundred and fifty at Bloomingdale. This witness testified that from the testimony in the case, he was clearly of the opinion that the prisoner was laboring under derangement of mind; that the act charged appeared to him to be an insane act; that it was not uncommon for monomaniacs to secrete, and to endeavor to escape; that cases of strict monomania were very rare, but do exist, and in such cases all conduct not affected by the peculiar delusion, may be perfectly rational. The cases of insane impulse are more frequent than those of monomania; acts done under insane impulse are more likely to be remembered than those done under the influence of monomania.

*Theodore L. Mason*, M. D., testified that insanity is the genus, monomania a species, and that the impulsive characteristic may be common to both general and partial insanity. He was of the opinion that the prisoner was partially insane, and that the act for which he was on trial, was done from an insane impulse

The evidence being closed, the case was submitted under the charge of the court.

*The Presiding Judge* charged the jury, that there was no question made, that the prisoner had done the act alleged in the indictment, and that the only question for them to decide was whether the prisoner at the time of the act done, was a responsible moral agent. That if at the time he did the act the prisoner was of sound mind, and capable of judging between right

The People *v.* Sprague.

and wrong, then he was guilty of the crime charged upon him, but if he was of unsound mind, and acting under an impulse which at the time overthrew or obscured his knowledge, or capacity to judge of right and wrong, then he was not capable of committing a crime, and must be pronounced not guilty. That it seemed quite unnecessary to go into any consideration of the question of general insanity, as the whole defence had been put upon the ground that the prisoner was partially insane, and that the peculiarity of his insanity consisted in what appears to the sane mind an objectless desire to possess himself of the shoes of females, and to hide and spoil them. That insanity, as a defence, was an affirmative matter; and in order to be allowed, must be proved beyond all reasonable doubt. If they were satisfied beyond reasonable doubt that the prisoner did the act charged in the indictment under an insane impulse, being at the time incapable of knowing right from wrong, it would be their duty to return a verdict of not guilty; but if they were not satisfied of the prisoner's insanity, it would be their duty to find a verdict of guilty.

After a short absence, the jury returned with a verdict of *not guilty*